Brinkerhoff, J.
After a careful and laborious examination of the voluminous testimony in the case, we are satisfied that the leading allegations in the original and supplemental bills are true. The contracts therein set forth exist. The complainants are stockholders, as they allege; and, after the allowance of the provisional injunction, it is evident, beyond controversy, that the principal officers, most influential managers, and controlling minds of the Mad River and Lake Erie company, set themselves deliberately at work to defeat the object of the original bill, and to evade, by indirection, the effect of the provisional injunction. To this end an organization, regular on its face, was contrived and effected under a legislative charter, authorizing the construction of a railroad, under the name of the Sandusky City and Indiana Railroad, from the city of Sandusky to the west line of Ohio, or the south line of Michigan, at the option of the corporation, naming no other point or terminus whatsoever; and passed February 28,1851. The stockholders of the Mad River and Lake Erie company, who became the controlling managers in the new company, under the almost unlimited power of selecting the route for their road, and the extent to which it might be constructed, which their charter permitted to them, determined to construct their road from the city of San-dusky, as far *as Tiffin, a point leaning somewhat toward the [132 west line of Ohio, and there to stop. A very few of the stockholders may have been duped into the expectation that the road might be carried further; but no such idea was seriously entertained by those who got up and controlled the corporation. No payments were ever made on subscriptions of stock in this corporation. The stockholders went through the forms of giving their notes for the amount of their subscriptions, but it does not appear that any of them were ever paid. The road was constructed to Tiffin; but by' the aid, with the means, and on the credit of the Mad River and Lake Erie company; for its use and to answer its purposes. A *133 large quantity of heavy iron rail which the Mad River and Lake-Erie company had purchased, and on hand for the purpose of relaying its old track from Sandusky to Tiffin, by way of Bellevue, was diverted from that object, laid upon the track of the Sandusky City and Indiana road, and the old line by way of Bellevue, although a pretense of still running a train of cars upon it has been persisted in — has, in fact, been suffered to go to decay. •
As soon as the Sandusky City and Indiana road, the creature of the Mad River and Lake Erie company, was completed to Tiffin, the latter company took a perpetual lease of the former road, in which it assumed all the debts of the new company, but contracted for the payment of no other rent whatever, and transferred to it all its machinery and business, except such as arose and lingered immediately on the line of its old dilapidated track, with its flat rail and rotting timbers, between Sandusky and Tiffin, by way of Bellevue. And thus the Mad River and’ Lake Erie company-effected by indirection, though under a punctilious observance of the forms of law, the very object which, under the prohibitions of the provisional injunction, or the requirements of the statutes here-133] after to be ^noticed, it either could not, or did not choose to effect directly, to wit., the actual, practical, change of its line from. Sandusky to Tiffin. For the Sandusky City and Indiana company,, though perfect in its external legal aspect, was, in substance, if the idea of substance can be attached to a thing which has no substance, the merest sham that can be imagined.
But while all this is true, it is also true that there wore strong and legitimate reasons for the Mad River and Lake Erie company to desire the change of route which it sought and'finally effected in the manner we have mentioned. In distance, the now route was-shorter; in curve and grade, it was much easier, and it afforded abundant supplies of water and material for ballast, in both of which the old route was very deficient. The directors of the company had originally adopted the route by way of Bellevue on the. recommendation of their chief engineer. This engineer had become a part proprietor with complainants in the town of Bellevue, then recently laid out and platted, and thus had a strong pecuniary intertest in the location of the road on the Bellevue route. He represented to the directors that he had surveyed the route on which the Sandusky City and Indiana road has since been located, when in truth he had done nothing of the kind. That the complainants. *134, 135 made him a part proprietor with themselves in their new town, with a view to influence the then pending question of the location of the road by way of their town, is probable; but it is not shown that the complainants were cognizant of the misrepresentations of the engineer; and if it were shown, we think the acquiescence of the directors, and their contracting with complainants on the assumption that the road was to remain at Bellevue, long after they had ample opportunity to discover, and had discovered the malconduct *of their engineer, and the retaining of the property [184 conveyed to the company under those contracts, must be held to estop them from claiming anything now, on this ground, against the complainants.
By the 10th section of an “ act regulating railroad companies,’, passed February 11, 1848, and in force at the time of the filing of the original bill in this case, it is enacted that “ whenever any rail, road company • • • shall find it necessary, for the purpose of avoiding annoyance to public travel, or dangerous or difficult curves or grades, or unsafe or unsubstantial grounds or foundations, or for other reasonable causes, to change the location or grade of any portions of their road, • • • such railroad company shall bo, and is hereby authorized to make such changes of grade and location, not departing from the points and general route prescribed in the charter of such company; • • • and shall, also, be liable in damages, when any have been caused by such change to the owner or owners of the lands upon which such road was theretofore located • • • provided, however, that no such change of the location of the road be made, unless approved by the board of public woi'ks,” etc.
This section of the statute, while the road of the Sandusky City and Indiana company was in process of construction, was superseded by the act of May 1, 1852, “ to provide for the creation and regulation of incorporated companies in the State of Ohio,” which is still in force, and which is the same in terms as the tenth section of the act of February 11, 1848, except that the clause making the consent of the board of public works necessary to authorize the change of location, is omitted.
It is hardly necessary to say, that in the actual change of the line of its road from Sandusky to Tiffin, which the Mad River and Lake Erie company has effected, it is not pretended *that it [185 has proceeded under the provisions of either of these statutes, or that it has complied with any of the provisions therein prescribed.
*136 The complainants now pray, that the lease of the Sandusky City and Indiana road by the Mad River and Lake Erie company, be decreed to be null and void; that the latter company be perpetually enjoined against the use of the former road; and for general re-, lief; and the first question presented for our determination is, whether the complainants, on the ground of their being stockholders in the Mad River and Lake Erie company, are entitled to the relief specifically prayed for.
The Mad River and Lake Erie company now claims that it was authorized to do all it has done by virtue of the twenty-fourth section of the act last above referred to (Swan’s Rev. Stat. 205), and which is as follows: “ Any railroad company heretofore or hereafter incorporated, may, at any time, by means of subscription to the capital of any other company, or otherwise, aid such company in the construction of its railroad, for the purpose of forming a connection of said last-mentioned road with the road owned by the company furnishing said aid; or any railroad company organized in pursuance of law, may lease or purchase any part, or all of any railroad constructed by any other company, if said companies' lines of said road are continuous, or connected as aforesaid, upon such terms and conditions as may be agreed on between said companies respectively; or any two or more railroad companies, whose lines are so connected, may enter into any arrangement for their common benefit, consistent with, and calculated to promote the objects for which they were created; provided, that no such aid shall be furnished, nor any purchase, lease, or arrangement perfected, until a meeting of the stockholders of each 186] of said companies shall have *been called by the directors thereof, at such time and place, and in such manner as they shall designate, and the holders of at least two-thirds of the stock of such company represented at such meeting, in person or by proxy, and voting thereat, shall have assented thereto.”
In the view which we take of this case, it is unnecessary for us to decide a question of construction arising under this section, which is, whether the Mad River and Lake Erie company has brought itself fairly within its provisions; or, in other words, whether the construction by one railroad company of another road entirely parallel with its own, which if owned and managed by an interest distinct from itself must necessarily be a competing road, for the purpose, and with the effect to bring about a change in a part of *137 its own line, rather than to create a feeder, or an extension of its •own line, is within the limits of such “ connections ” as were contemplated by the general assembly in this enactment? But, waiving this question, was it constitutionally competent for the legislature to authorize this company to embark in new enterprises, ■entirely beyond the scope, and outside of the objects contemplated ■by its charter, at the time the complainants became members of the corporation by subscribing to its stock, and then to effectuate ••a fundamental change in its charter, and in the risks and prospects •of its stockholders, without the consent of all its stockholders? 'We think the affirmative of this question to be at least doubtful. And the contrary was directly held’by the chancellor of the third circuit of Yermont, in an' able opinion, powerfully sustained by .authority, and resting, it seems to us, on a basis of reason which it will be found difficult to overthrow. Stevens v. Rutland & Burlington Railroad Co., 1 Law Reg. 154.
While, therefore, we find it impossible to claim for the legislature any such power, and conceding, for thé sake of *the ar- [IS? gument, that it has no such power, we are quite clear that, before a stockholder can be entitled to a remedy by injunction against •such departure from the original objects of the incorporation, he must have shown himself prompt and vigilant in the assertion of his rights, as such stockholder. It will not do for him to wait until the mischief of which he complains is accomplished, fortunes expended, and great public interests created. If he do, he must be held to have acquiesced in the change, or to content himself with some other form of remedy.
Now, the original bill in this case was filed, and the provisional injunction allowed, before the Mad River and Lake Erie company had made any expenditure in the construction of the Sandusky City and Indiana road; but the original bill, and first supplemental bill, both proceeded on the ground of contract alone, setting up no claim that their rights as stockholders were about to be violated A claim to relief on this ground is first presented in the second supplemental bill, after the Mad River and Lake Erie company had exhausted alike its means and its credit in the construction of the new road, and thereby rendered itself unable to repair its old line, even if it had the disposition to do so. It is true, the original bill states the fact that they are stockholders; but the statement is incidentally made, solely for the purpose of showing the consideration. *138, 139 of one of the contracts, which it sets forth as the basis of the relief sought. We-are not satisfied, therefore, that the complainants arc in time to demand this form of relief, on the ground of the violation of their rights as stockholders.
Moreover, there is a limit to the powers of this court. Suppose we were to declare the lease of the Sandusky City and Indiana road to the Mad River and Lake Erie company to be fraudulent, null, and void; and were to perpetually enjoin the latter .company against 138] connecting with, ^running upon, or using the former road ?— to what end? Wo could not compel the Mad River and Lake Erie company to use its old line — it is at present unfit for use — we could nqt compel them to repair it; and, indeed, it is more than doubtful whether it now has either the means or the credit to repair it; and the only effect of such a decree, we apprehend, would ho to bring about a transfer of freight and passengers from one road to the other at Tiffin, without benefiting, in the remotest degree, the pecuniary interests of the complainants, on the one hand; while, on the other, we would materially prejudice great public and private interests.
But, does it follow from all this, that the complainants are entitled to no remedy? We think not. On the part of the complainants, it is contended that the contracts between them and the Mad River and Lake Erie company, bound the latter to keep up and maintain its road on the line through Bellevue forever. On the part of the company, it is contended that by the location of their road through Bellevue, and the allowance of the privileges of sidetracks and warehousing, stipulated for by conrplainants, their contracts have been literally fulfilled and executed, and their obligation is at an end. We think that, by a fair interpretation of those contracts, it is implied that the privileges stipulated for by the complainants should continue at least until the line of road through Bellevue should be lawfully changed.
Now, this line has been changed — changed by indirection,'it is true, and not in name, but still, in substance and in fact, changed. In effecting this change of line, the company has hitherto avoided the performance of a condition prescribed by the statute as precedent to a change; to wit, the payment of damages, “when any have been caused by such change, to the owner or owners of the 139] *lands upon which such road was heretofore constructed.” And this seems to us to suggest an answer to the next and last *140 inquiry, which remains to us in this case. Are we at liberty to-adopt a remedy by compensation ?
The analogies, spirit, and policy of the statutes before quoted, seem to point to such a remedy, and we are strongly impressed with the conviction that the equities of the case demand it.
The particular remedy by injunction, prayed for by the complainants in this case, is in the nature of, and is sought by the complainants, in order that it may operate so as to enforce, a specific performance of the contracts between them and the railroad company.
It seems to be well settled that where it is found that a complainant was originally entitled to a specific performance, but pending the litigation, the very subject-matter of the agreement, to which the complainant is found to be entitled, is abstracted or destroyed, a court of equity will not turn him over to seek his damages in a court of law, but will afford a remedy by compensation. Story’s Equity Jurisprudence, sec. 794, notes, and cases there cited.
Now the case before us seems to come fairly within this principle. The complainants demand the continued use of the line of railroad by way of Bellevue. To this, by the terms and spirit of their contracts, they were fairly entitled. But pending the proceedings, this line has gone to decay; the means and credit of the-company have been elsewhere exhausted ; the repair of the old line would involve the necessity of an immense expenditure, which the company, even if we were to decree the injunction prayed for,, would have no interest in making, and which we would have no power to enforce. In this way the subject-matter of the contracts has been substantially annihilated; and nothing ^remains to [140-us but to award the complainants a remedy by compensation.
A decree will therefore be entered, dissolving the provisional injunction, and referring the case to a special master for this purpose to inquire and report:
1. The amount, up to the first day of March, 1857, of the par value of complainants’ stock in the Mad River and Lake Erie Railroad Company, and unpaid dividends thereon, provided the complainants shall file with said master, and to his acceptance, a transfer, in writing, of their stock aforesaid, to said company.
2. The value of the lots which complainants donated and conveyed to said Mad River and Lake Erie Railroad Company; such value to be estimated at the date of the location of said road through. *141 Bellevue, with interest on such value from the date of the filing of ■the original bill in this case until the 1st of March aforesaid.
3. The dimunition in value of complainants’ two warehouses and .side-tracks, occasioned by the construction and use of the Sandusky City and Indiana Railroad.
4. Compensation to complainants for the right of way through ■their land, to be computed according to its value, when the Mad River and Lake Erie Railroad Company commenced the use of the ■ Sandusky City and Indiana Railroad ; and up to a time from which the said Mad River and Lake Erie Railroad Company shall release and quitclaim the same to complainants, by deed, to be filed with, .and to the acceptance of, said master; and if said company shall fail to file with said master, and to his acceptance, such deed of release and quitclaim, then said computation to be made on the assumption that such right of way is to be perpetual in said company.
5. That said master report at the present term of this court. 141] *And, following out a remedy analogous to the requirements of the eleventh section of .the act of May 1, 1852 (Swan’s Stat. 202), which makes the payment of compensation a condition precedent to the right to change the location of the road, and for the purpose of securing the payment of the compensation awarded ■to the complainants, an alternative decree will also be entered, enjoining the Mad River and Lake Erie company against the use of ■the Sandusky City and Indiana road, to take effect after a reason.able time, to be named in the decree, in case of default in the payment of the compensation awarded, and to continue during such •default.
Bartley, C. J., and Swan, Bowen, and Scott, JJ., concurred.